## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANNA MICHELE TESTERMAN      :
     :
     v.      :      Civil No. CCB-13-3048
     :
THE PROCTER & GAMBLE      :
MANUFACTURING COMPANY      :

### MEMORANDUM

In October 2013, plaintiff Anna Michele Testerman brought this action against her former employer, The Procter & Gamble Manufacturing Company ("the Company").[1]  Ms. Testerman asserts that the Company discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and state law, discriminated against her on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), interfered with her rights under the Family and Medical Leave Act ("FMLA"), and retaliated against her for exercising her rights under those laws.  Before the court is the Company's motion for summary judgment.  The parties have fully briefed the issues, and no hearing is necessary.  *See* Local R. 105.6 (D. Md. 2014).  For the reasons that follow, the motion will be granted in part and denied in part.

### BACKGROUND

### I.  Factual History

### A.  Ms. Testerman's Employment with the Company

The Company operates a warehouse distribution center ("the warehouse") in Joppa,

---

[1] As the court has previously noted, the defendant represents that Ms. Testerman was employed by Noxell Corporation, not The Procter & Gamble Manufacturing Company.  (*See* Answer 1 n.1, ECF No. 5 ("Plaintiff's Complaint is erroneously captioned.  Undersigned represents that Plaintiff was employed by Noxell Corporation and, as such, Noxell Corporation is the proper Defendant to her suit.").)

Maryland, where it receives, stores, and ships salon and makeup products.  (Kaba Aff. ¶ 3, Def.'s Ex. 2, ECF No. 35-4.)  Ms. Testerman's relationship with the Company appears to have begun in 2005, when she applied for a job operating forklifts at the warehouse.  In October 2005, as part of her application process, she submitted to the Company a completed health questionnaire indicating that she had diabetes.  (Health Questionnaire 2, Pl.'s Ex. 2, ECF No. 45-2.)  The Company hired her to work part time as a "Warehouse Technician Level I," and on November 14, 2005, Ms. Testerman began working on the night shift at the warehouse.  (Employment and Absence Summary, Pl.'s Ex. 1, ECF No. 45-1; Testerman Aff. ¶ 2, Pl.'s Ex. 4, ECF No. 45-4; Testerman Dep. 18, Def.'s Ex. 1, ECF No. 35-3.)  In this capacity, she operated both a "stand-up" forklift,[2] which requires the driver to stand during its operation, and a "sit-down" forklift, which requires the driver to sit.  (Testerman Dep. 18; Testerman Aff. ¶ 5.)  She advanced to the next pay level for her position about a year into her employment, (Testerman Aff. ¶ 2), and was transferred to the day shift in December 2008, (Testerman Dep. 18).  The other individuals on her work "team" included both men and women.  (*Id.* at 19.)

On June 22, 2009, the Company promoted Ms. Testerman to the full-time position of "Warehouse Technician Level II," and issues arose almost immediately.  (Employment and Absence Summary; Testerman Aff. ¶ 4.)  Her coworkers in this new position were all men, and she felt that they "consistently berated and criticized [her] for unfair or incorrect reasons[.]" (Testerman Aff. ¶ 4.)  She had trouble bearing the summer heat in the warehouse, a problem her doctor later attributed to her diabetes.  (Medical Notes 3, Pl.'s Ex. 12, ECF No. 45-12.)  And though she began a process of taking time off under the FMLA because of her heat issues, that process was unsuccessful.

---

[2] The Company refers to the stand-up forklift as a "rack jack."  (*See* Def.'s Br. 3, ECF No. 36.)

### B.  Interactions with Coworkers

Ms. Testerman recounts the following negative experiences with her coworkers:

- Shortly after she assumed her full-time position in the summer of 2009, she asked a supervisor if a fan could be placed in a particular area to help her cope with the heat.  The supervisor did not place a fan there.  The next day, however, Ms. Testerman found a drawing of a fan on a piece of cardboard in that location.  (*See* August 2010 ER Case Closure Report 2-3, Def.'s Ex. 13, ECF No. 35-15; Fan Drawing, Pl.'s Ex. 13, ECF No. 45-13.)[3]

- Ms. Testerman received a text message asking if she wanted to "meet in the park" after her shift.  (Testerman Aff. ¶ 7.)[4]  She believed the message sought a date.  (*Id.*)  She sent a reply to the message asking who had sent it, and the response was "a secret admirer."  (*Id.*)  When she looked up from her phone, she saw a coworker, Jeffrey Bachman, staring at her and laughing.  (*Id.*)

- On several occasions, Ms. Testerman observed a supervisor, Michael Hoeck, "staring out of a window at [her] as [she] arrived for work in the morning."  (Testerman Aff. ¶ 8; Suppl. Testerman Dep. 186, Def.'s Reply Ex. 1, ECF No. 48-1.)  Ms. Testerman considered this to be stalking, and several of her coworkers "teased" her that her "boyfriend" was watching her.  (Testerman Aff. ¶ 8.)[5]

- A male coworker, Mike Bream, found on the internet a record of a court order relating to

---

[3] A fan apparently was placed in this location in July 2010 after temporary contractors complained of excessive heat. (*See* August 2010 ER Case Closure Report 3.)

[4] Ms. Testerman does not indicate a date for this incident.

[5] In her complaint, however, Ms. Testerman alleged that Mr. Hoeck's behavior was "an attempt to catch [her] arriving late," (Compl. ¶ 22, ECF No. 1), and she reiterated that view of his motivation in her deposition, (Suppl. Testerman Dep. 189).  She also testified in her deposition that Mr. Hoeck was "not a supervisor," but rather "a co-worker."  (*Id.*)

a domestic dispute between Ms. Testerman and her former husband, printed that record, and brought it to work. He and other male coworkers discussed the record, and said it was evidence Ms. Testerman "hated men." (*Id.* ¶ 9; Suppl. Testerman Dep. 304-05.)

- One of Ms. Testerman's male coworkers told her that the reason she was having difficulty with the heat in the warehouse was because she was "sweating from menopause." (Suppl. Testerman Dep. 290.)

Ms. Testerman "repeatedly" complained to Company representatives about the above issues. (Testerman Dep. 90.) On May 28, 2010, she met with Kristin Soler, the Company's human resources manager at the warehouse, to complain of, among other things, inconsistent rotation between the stand-up and sit-down forklifts, and dismissive comments from her coworkers such as "she doesn't know what she's doing." (*See* May 2010 ER Case Closure Report 1, Def.'s Ex. 4, ECF No. 35-6.) As part of her investigation into Ms. Testerman's complaints, Ms. Soler interviewed several of Ms. Testerman's coworkers. One of them, Bernie Janiski, referred to Ms. Testerman's work team as "a boy's club," and stated that people "disrespected" Ms. Testerman and talked to her in a "demeaning" way. (*Id.* at 2.) Several of the individuals interviewed suggested that Ms. Testerman was slower than others on the stand-up forklift, which reduced productivity. (*Id.* at 1.) On June 9, 2010, Ms. Soler convened an "issue resolution" meeting attended by Ms. Testerman, Mr. Bream, Ms. Soler, and Rebekah Kaba, an operations team leader at the warehouse and Ms. Testerman's second-level supervisor. (*Id.* at 3; Kaba Aff. ¶¶ 2, 7.) Ms. Soler instructed Mr. Bream to provide Ms. Testerman with feedback "in a private manner" and "not to raise his voice" to her, while Ms. Testerman was instructed "to be open to feedback[.]" (May 2010 ER Case Closure Report 3.) Though Ms. Testerman does not

point to specific examples, issues with her coworkers appear to have continued until she was terminated in February 2012.

### C.  Health

Ms. Testerman had difficulty working in the summer heat, which in the warehouse sometimes exceeded 90 degrees Fahrenheit.  (Fisher Email, Pl.'s Ex. 10, ECF No. 45-10.)  On at least one particularly hot day during the summer of 2010, the heat caused her to experience stomach problems and lightheadedness, among other symptoms.  (Employee Incident Report, Pl.'s Ex. 11, ECF No. 45-11.)  She believed that if a fan were used in a particular location it would help with her heat issues when she operated the sit-down forklift.  (Testerman Dep. 69.)  Though a fan was placed at that location in July 2010 at the request of temporary contractor workers who complained about the heat, (August 2010 ER Case Closure Report 3), Ms. Testerman's coworkers thought it interfered with the operation of a plastic stretch wrapper machine in that area, and resisted her efforts to use it, (Testerman Dep. 69; Kaba Aff. ¶ 10).  Ms. Testerman spoke with Ms. Kaba about this issue on August 12, 2010.  (Kaba Aff. ¶ 9.)  That same day, Ms. Testerman saw the Company's doctor, James Kleeman.  (*See* Medical Notes 2.) She brought with her a note from a physician, Dr. Kristin Clark, indicating that she suffered "from heat related illness."  (*Id.* at 4.)  On August 24, 2010, Ms. Testerman complained again to Ms. Soler, this time complaining of excessive heat along with other concerns.  (August 2010 ER Case Closure Report.)  When Ms. Testerman met with Dr. Kleeman again on August 26, 2010, she brought a note from another physician indicating that she had "Diabetic Mellitus Type II and the excessive heat conditions at work may destabilize her autonomic regulation of heat." (Medical Notes 1, 3.)  Dr. Kleeman's notes from the August 26 encounter, however, suggest that

Ms. Testerman's "medical condition is not unique and she needs the same assist[ance] of fluids and ventilation as the rest of her coworkers." (*Id.* at 1.)  Ms. Testerman's attendance record shows that she took a total of five sick days in July and August 2010, plus an unpaid absence. (Employment and Absence Summary.)

On August 27, 2010, Ms. Testerman provided the Company with an FMLA certification completed by Dr. Clark.  (*See* FMLA Certification, Pl.'s Ex. 15, ECF No. 45-15.)  In that certification, Dr. Clark stated that Ms. Testerman had "unstable autonomic regulation of heat" causing "[e]xtreme heat intolerance" that rendered her "[u]nable to function in extreme heat." (*Id.* at 2.)  On August 30, 2010, the Company's nurse, Ms. Brumwell, provided Ms. Testerman with a written response to the FMLA request, informing her that the Company needed her doctor to be more specific as to the precise temperature range for heat inside the warehouse that would cause Ms. Testerman to experience health issues.  (FMLA Emails 2, Pl.'s Ex. 16, ECF No. 45-16.)  Ms. Testerman at first seemed to refuse to provide that clarification, telling Ms. Brumwell in an email that the "forms should be sufficient as completed . . . ." (*Id.* at 1.)  She briefly withdrew her submission of Dr. Clark's forms, but sought to resubmit them after an endocrinologist she visited was "unable to clarify the temperature range . . . ." (*Id.* at 5.)  Ms. Testerman "repeatedly" asked the Company "what the inside temperatures were so that [she] could go back to [her] doctor and discuss the temperatures and the effect [they] had" on her. (Testerman Dep. 95.)  No one in the Company, however, agreed to provide her that information. (Testerman Aff. ¶ 11.)

On October 15, 2010, Ms. Testerman filed a charge of discrimination with the EEOC, asserting violations of Title VII and the ADA.  (Charge of Discrimination, Pl.'s Ex. 17, ECF No.

6

45-17.)

### D. Discipline and Termination

Ms. Testerman was disciplined several times concerning her attendance during the summer and fall of 2010.  (*See* Written Helpful Advisory Talk, Def.'s Ex. 19, ECF No. 35-21; Written Warning, Def.'s Ex. 21, ECF No. 35-23.)  That winter, on December 8, 2010, Ms. Testerman crashed a forklift into a wall and was found responsible for the accident.  (Incident Analysis, Def.'s Ex. 23, ECF No. 35-25.)  A year later, on December 20, 2011, several boxes on one of the pallets Ms. Testerman was moving fell, and the Company found Ms. Testerman responsible for this incident as well.  (Menon Aff. ¶ 2, Def.'s Ex. 26, ECF No. 35-28; December 2011 ER Case Closure Report, Def.'s Ex. 27, ECF No. 35-29.)  A few days later, on December 23, 2011, several cosmetic cases that were supposed to have been shipped the previous day were found in the warehouse, and the Company determined that Ms. Testerman was responsible for this "miss-shipment."  (Menon Aff. ¶ 3.)  Finally, on February 8, 2012, Ms. Testerman nearly caused another "miss-shipment" when she improperly moved a pallet, (*id.* ¶4), and used a Company computer after her shift to investigate the incident, (*id.* ¶ 5).  On February 13, 2012, the Company terminated Ms. Testerman's employment.  (Termination Letter, Def.'s Ex. 30, ECF No. 35-32.)  The Company says it terminated Ms. Testerman because of the December 2010 forklift accident, the December 2011 pallet incident, the December 2011 miss-shipment, and the February 2012 loading incident, (Menon Aff. ¶ 6), although her termination letter stated more generally that she was terminated "for the unacceptable performance incident on 02/08/2012 in conjunction with [her] prior disciplinary record," (Termination Letter).

### II.  Procedural History

Ms. Testerman filed an eight-count complaint in this court on October 14, 2013, alleging (1) a hostile work environment in violation of Title VII; (2) retaliation in violation of Title VII; (3) a hostile work environment in violation of Md. Code Ann., State Gov't § 20-606(a)(2)(i); (4) retaliation in violation of Md. Code Ann., State Gov't § 20-606(a)(2)(i);[6] (5) interference with her rights under the FMLA; (6) retaliation in violation of the FMLA; (7) failure to accommodate her disability in violation of the ADA; and (8) retaliation in violation of the ADA.

On March 21, 2014, Ms. Testerman's counsel moved to withdraw.  The court granted that motion on March 24, 2014.  On May 27, 2014, Ms. Testerman, now acting pro se, filed a motion to quash the Company's subpoena for her medical records.  On June 19, 2014, Ms. Testerman moved to compel the Company to provide fuller answers to her first set of interrogatories.  On September 2, 2014, the Company filed a motion for summary judgment.  Ms. Testerman then obtained a new attorney, who filed his notice of appearance on September 19, 2014.  Now counseled for the first time since March 2014, Ms. Testerman opposed the motion for summary judgment on October 17, 2014.  In a memorandum and order on January 9, 2015, the court largely denied Ms. Testerman's motion to quash, but granted her motion to compel to the extent it sought information concerning the identity of a former employee of the Company who Ms. Testerman claimed was fired as a result of harassment by her male coworkers.  On March 9, 2015, Ms. Testerman filed a short declaration by La Kesha Roberts, a former employee of the Company who claimed the Company terminated her because of harassment.  On March 26, 2015, the Company responded with the declaration of David Ritterpusch, a supervisor at the Company, who asserted that Ms. Roberts was fired in 2006—several years before the alleged

---

[6] Ms. Testerman presumably meant to refer to Md. Code Ann., State Gov't § 20-606(f), which is that section's retaliation provision.

8

harassment at issue in this case—for issues including excessive absenteeism and tardiness.

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)), *cert. denied*, 134 S. Ct. 681 (2013). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)).

## I.    Hostile Work Environment

Ms. Testerman asserts hostile work environment claims under both Title VII and Md. Code Ann., State Gov't § 20-606(a)(2)(i), part of Maryland's Fair Employment Practices Law.

Maryland courts "consult[ ] federal precedent in the equal employment area" because of the lack of applicable state law jurisprudence, *Taylor v. Giant of Maryland, LLC*, 33 A.3d 445, 459 (Md. 2011), and the parties agree that this court may look exclusively to federal law to assess Ms. Testerman's hostile work environment claims under both Title VII and Maryland law.

Title VII prohibits employers from, among other things, "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)). "A hostile work environment is one 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "To establish a hostile work environment based on sexual harassment under [Title VII], a plaintiff-employee must prove that (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013).

The Company argues that the conduct Ms. Testerman complains of was neither based on her gender nor sufficiently severe or pervasive. The Company also argues that some of the

conduct is time-barred from consideration, the *Faragher-Ellerth* affirmative defense[7] protects it

from liability, and the assertions in Ms. Testerman's affidavit should be rejected as contradictory

to her deposition testimony.   Because Ms. Testerman has not provided enough evidence for a

reasonable jury to determine that any harassment she suffered was sufficiently severe or

pervasive, the court will grant the Company's motion for summary judgment on her sexual

harassment claims on that basis alone, and will not address the Company's other arguments as to

those claims.

The severe or pervasive "prong of a hostile work environment claim has 'both subjective

and objective components.'"   *Walker*, 775 F.3d at 208 (quoting *EEOC v. Central Wholesalers,

Inc.*, 573 F.3d at 167, 175 (4th Cir. 2009)).   Ms. Testerman has established a genuine issue of

material fact as to whether she subjectively viewed her work environment to be abusive or

hostile.   (*See, e.g.*, Testerman Aff. ¶ 4 (asserting that members of her all-male team "consistently

berated and criticized [her] for unfair or incorrect reasons").)   She has not done so, however, for

the objective component.   "[T]he objective severity of harassment should be judged from the

perspective of a reasonable person in the plaintiff's position, considering 'all the

circumstances.'"   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting

*Harris*, 510 U.S. at 23).   "This is not, and by its nature cannot be, a mathematically precise test."

*Harris*, 510 U.S. at 22.   Rather, it "rests on a variety of factors, including 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'"   *Walker*, 775 F.3d at 209 (quoting *Harris*, 510 U.S. at 23).   *See also Oncale*, 523

U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of

---

[7] *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). The Fourth Circuit has made clear, however, that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test, . . . and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "Thus, complaints premised on nothing more than 'rude treatment by coworkers,' 'callous behavior by one's superiors,' or 'a routine difference of opinion and personality conflict with one's supervisor,' are not actionable under Title VII." *Id.* at 315-16 (brackets and internal citations omitted). "Importantly, however, an isolated incident of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (internal quotation marks and brackets omitted).

Ms. Testerman points to the following as evidence of a hostile work environment: (1) Mr. Janiski's description of Ms. Testerman's work team as "a boy's club," (May 2010 ER Case Closure Report 2); (2) the anonymous text messages Ms. Testerman received, (Testerman Aff. ¶ 7); (3) Ms. Testerman's observation of Mr. Hoeck watching her arrive for work in the morning, (*id.* ¶ 8); (4) the incident involving a court record concerning Ms. Testerman's domestic dispute, (*id.* ¶ 9); (5) the menopause comment, (*id.* ¶ 10); and (6) Ms. Roberts's declaration suggesting she was terminated for rebuffing a coworker's advances,[8] (Roberts Decl., ECF No. 54-1).[9]

---

[8] Ms. Roberts, Ms. Testerman's former coworker, asserts that a male coworker on the night shift "made it known that he was 'interested' in [her] (in other words, in a 'dating' way)." (Roberts Decl. ¶ 4, Pl.'s Suppl. Resp., ECF No. 54-1.) When she was promoted to the day shift, she says she told her supervisor, who she "believe[s] was Michael Hoeck," about her issues with the male coworker, but the supervisor told this coworker of her complaints, and then "wrote [her] up for baseless or trumped-up infractions." (*Id.* ¶¶ 5-6.) Ultimately, Ms. Roberts says she was terminated due to the actions of her supervisor and the male coworker. (*Id.* ¶ 7.) The Company disputes both the content and evidentiary value of the declaration, and offers the affidavit of Ms. Roberts's former supervisor, Mr.

None of the individual incidents Ms. Testerman complains of was so "odious" that, on its own, a reasonable jury could find that it established a hostile work environment.  *See Boyer-Liberto*, 786 F.3d at 280 (holding that a supervisor's use of the slur "porch monkey" twice in a 24-hour period could establish a hostile work environment).  Ms. Testerman has not presented evidence as to the frequency of much of the conduct she viewed as harassment.  Even assuming it was relatively frequent, however, it was not overtly sexual, did not involve touching or physically threatening behavior, and did not directly interfere with the performance of her job duties.  Though "a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions," *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000), Ms. Testerman has not produced evidence to show that her work environment was "consumed by remarks" or actions "that intimidate, ridicule, and maliciously demean the status of women," *id.*  And while the Fourth Circuit has not limited viable hostile work environment claims to the "precise behaviors . . . alleged to have occurred" in previous cases, *Walker*, 775 F.3d at 209, the conduct alleged here does not approach the severity of that described in recent Fourth Circuit cases allowing hostile work environment claims to survive summary judgment.  *See, e.g.*, *id.* at 205 (the plaintiff's coworker made vulgar "sex-based comments to her and other co-workers on a near-daily basis"); *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (the plaintiff's supervisor forcibly kissed her, sexually propositioned her, and repeatedly asked

---

Ritterpusch.  Mr. Ritterpusch says he terminated Ms. Roberts in 2006 for issues including excessive absenteeism, tardiness, and improper payroll data entry, and that Mr. Hoeck was not a supervisor while Ms. Roberts worked at the Company.  (Ritterpusch Aff. ¶¶ 3-4, Def.'s Resp. to Pl.'s Suppl. Resp., ECF No. 55-1.)  Though evidence that a plaintiff's coworkers "experienced treatment similar to that claimed by" the plaintiff may be admissible where that evidence is relevant, *Ziskie v. Mineta*, 547 F.3d 220, 225-26 (4th Cir. 2008), the fact that Ms. Roberts's declaration includes no information as to when the conduct at issue occurred (and that it was at least several years before the conduct at issue in this case) renders that declaration irrelevant and lacking evidentiary value.  Even if it were marginally relevant, however, it would not change the court's analysis or conclusions.

[9] Ms. Testerman, apparently, does not suggest that the fan drawing should be viewed as evidence of a hostile work environment.

her sexually charged questions); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 326-27 (4th Cir. 2011) (the plaintiffs' coworkers placed sexually provocative photographs throughout the workplace, and affixed a tampon to her key ring).

Viewed in its totality, the evidence here would not allow a reasonable jury to find that the harassment in Ms. Testerman's work environment was severe or pervasive.  Accordingly, the court will grant the Company's motion for summary judgment as to Ms. Testerman's hostile work environment claims.

## II.     Title VII Retaliation

Ms. Testerman also asserts retaliation claims under both Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), and Md. Code Ann., State Gov't § 20-606.[10]  She argues she was disciplined, and ultimately terminated, in retaliation for asserting her rights under those statutes.  Title VII bars discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "To survive an employer's motion for summary judgment" on a Title VII retaliation claim, "a plaintiff must show direct evidence of a Title VII violation, or establish a prima facie case that raises an inference of illegal conduct." *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 587 (D. Md. 2012).  Ms. Testerman does not put forth direct evidence that she was retaliated against for an impermissible purpose, and therefore must establish a prima facie case.

To state a prima facie case of retaliation under Title VII, a plaintiff must show that (1)

---

[10] The parties appear to agree that the court may look to federal law to assess Ms. Testerman's state law retaliation claim.  *See Chappell v. S. Md. Hosp., Inc.*, 578 A.2d 766, 773 (Md. 1990).

she engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against her; and (3) the protected activity was causally related to the employer's adverse action. *Okoli*, 648 F.3d at 223. "[W]hen a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005). "If the defendant carries this burden, the presumption of retaliation falls, and the plaintiff bears the ultimate burden of proving that the defendant's non-retaliatory reason for the adverse employment action was pretextual." *Id.* "A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is 'unworthy of credence' or by offering circumstantial evidence sufficiently probative of the issue of retaliation." *Vicino v. Maryland*, 982 F. Supp. 2d 601, 613 (D. Md. 2013) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).

Ms. Testerman's relevant disciplinary incidents are as follows: (1) "coaching" relating to the attendance policy on August 4, 2010, (*see* Written Helpful Advisory Talk); (2) a "written helpful advisory talk" for an "incidental absenteeism" rate of 2.31%, which was above the Company's 1% target, on October 14, 2010, (*id.*); (3) a written warning on November 19, 2010, for an incidental absenteeism rate of 2.86%, (Written Warning); (4) the December 2010 forklift crash, (Incident Analysis); (5) the December 2011 dropped boxes, (Menon Aff. ¶ 2; December 2011 ER Case Closure Report); (6) the December 2011 "miss-shipment," (Menon Aff. ¶ 3); (7) the improper pallet movement in February 2012 that nearly caused another "miss-shipment," (*id.* ¶ 4); (8) Ms. Testerman's use of a Company computer to "run a transaction report" on the pallet, despite having been told by Ms. Kaba that she should conduct company business only on

company time, (*id.* ¶ 5); and (9) Ms. Testerman's termination on February 13, 2012, (Termination Letter).

The Company does not dispute that Ms. Testerman engaged in protected activity, or that the disciplinary incidents described above qualify as adverse action.  Rather, the Company argues that Ms. Testerman cannot establish either a causal connection between her filing of an EEOC charge and her discipline or termination, or that the Company's proffered reasons for her discipline and termination were pretextual.

First, as to the causation argument, the Company points out that it did not receive notice of Ms. Testerman's EEOC charge until December 9, 2010, (*see* Notice of Charge of Discrimination, Def.'s Ex. 20, ECF No. 35-22), which was after both her "written helpful advisory talk" for a high rate of unexcused absences on October 14, 2010, and her written warning for the same issue on November 19, 2010.  The Company says that absent its knowledge of the EEOC charge, Ms. Testerman cannot show a causal connection between the charge and either disciplinary event.  *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").  The Company also argues that Ms. Testerman cannot show that "the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).[11]

_____

[11] The Fourth Circuit recently clarified that *Nassar*'s but-for causation standard does not apply to the causation element of a prima facie case of retaliation.  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 251 (4th Cir. 2015).  Instead, because the *McDonnell Douglas* burden-shifting framework already requires a plaintiff to offer proof at the pretext stage sufficient for a reasonable jury to find that retaliation was a but-for cause of the challenged

Although protected activity includes more than the filing of an EEOC charge, Ms. Testerman does not argue that her complaints to the Company regarding the behavior she perceived as sexual harassment constituted the protected activity for which she was retaliated against.  Rather, she focuses only on evidence that she believes demonstrates the Company's knowledge of her intent to pursue legal action.  She first points to the "progress notes" of Margie Brumwell, the Company's nurse.  (Progress Notes, Pl.'s Ex. 19, ECF No. 45-19.)  These notes include a notation made by Ms. Brumwell on September 7, 2010, indicating that Ms. Testerman told her "she will get an attorney."  (*Id.* at 2.)  But this statement was made in the context of a discussion concerning FMLA leave, and therefore cannot establish the Company's knowledge of protected activity under Title VII.

Ms. Testerman next points to two interactions she had with one of the Company's supervisors, Clarence White.  (*See* Testerman Aff. ¶ 12; Suppl. Testerman Dep. 256-59.)  In the first interaction, which Ms. Testerman says occurred "in approximately October 2010," Ms. Testerman complained to Mr. White "about the harassment by male co-workers."  (Testerman Aff. ¶ 12.)  Mr. White said he would "request more information," and asked Ms. Testerman "to come up with a plan" for her "employment goals[.]"  (*Id.*)  In the second interaction, which Ms. Testerman says occurred "in early November 2010," Mr. White "told [her] that he could no longer help [her] because [she] had filed a legal action," (*id.*), in which she had alleged "the warehouse was not a friendly environment for women," (Suppl. Testerman Dep. 256).

Ms. Testerman's interactions with Mr. White suggest that the Company may have been aware of her intent to pursue legal action against it as of early November 2010, but not before then.  Thus, the Company is correct that Ms. Testerman has failed to show the Company's

---

adverse employment action, "*Nassar* does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim."  *Id.* at 252.

knowledge of her intent to pursue legal action for alleged sexual harassment when she received the "written helpful advisory talk" on October 14, 2010.  As Ms. Testerman herself testified, she did not file her EEOC charge until October 15, 2010, the day after she received this discipline. (*Id.* at 257.)   As to her written warning for incidental absenteeism on November 19, 2010, however, Ms. Testerman's interaction with Mr. White in early November 2010 is sufficient to establish the Company's knowledge of her intent to pursue legal action.   Although Ms. Testerman does not explain how the Company could have learned of that intent before receiving the EEOC's notice of charge on December 9, 2010, she was clear in her deposition that Mr. White told her the Company knew she "had filed some sort of legal action" alleging that "the warehouse was not a friendly environment for women."  (*Id.* at 256.)

But this alone is not enough to allow her Title VII retaliation claim to proceed.   The Company has offered legitimate, non-discriminatory explanations for both the written warning (i.e., Ms. Testerman's incidental absenteeism rate) and termination (i.e., the various disciplinary incidents leading up to her termination).   Ms. Testerman's only argument in response is that the Company's claim that it lacked knowledge of Ms. Testerman's legal action until December 9, 2010, is false, and this falseness "colors all of the other disciplinary actions and establishes facts from which the jury could infer pretext[.]"  (Pl.'s Br. 22, ECF No. 45.)  Although the Company was aware of Ms. Testerman's complaints of general mistreatment, its claimed lack of knowledge as to her legal action is not so egregious as to allow a jury to infer pretext.  Ms. Testerman has not put forth enough evidence, therefore, for a reasonable jury to determine that the Company's explanations are unworthy of credence.   And even assuming *arguendo* that Ms. Testerman's argument was enough to establish pretext, there is simply not enough evidence for a

reasonable jury to find that the Company's desire to retaliate against Ms. Testerman for her exercise of protected activity under Title VII was a cause of her discipline or subsequent termination, which did not occur until February 2012.  Accordingly, the Company's motion for summary judgment on Ms. Testerman's retaliation claims under Title VII and Maryland law will be granted.

## III.   FMLA Interference

The Company also has moved for summary judgment on Ms. Testerman's FMLA interference claim.  The FMLA is intended to allow "employees to take reasonable leave for medical reasons[.]"  29 U.S.C. § 2601(b)(2).  When it applies, it "entitles eligible employees to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons, *see* 29 U.S.C. § 2612(a)(1), and ensures that these employees will be restored to their same or an equivalent position upon returning to work, *see id.* § 2614(a)(1)."  *Rhoads v. FDIC*, 257 F.3d 373, 381-82 (4th Cir. 2001).  Claims of alleged violations of the FMLA's "prescriptive" rights (FMLA provisions that require employers to undertake certain actions and create entitlements for employees) are "known as 'interference' or 'entitlement' claims[.]"  *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).  Such claims "arise under 29 U.S.C.A. § 2615(a)(1), which states that '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.'"  *Id.* (quoting 29 U.S.C. § 2615(a)(1)).

"An employee is mandated to provide notice to her employer when she requires FMLA leave."  *Rhoads*, 257 F.3d at 382.  "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable . . . ."  29

C.F.R. § 825.303(a).   This notice must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," such as information concerning a health condition that "renders the employee unable to perform the functions of the job . . . ." *Id.* § 825.303(b).   "[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA" when providing notice.   *Id.*   However, "[a]n employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." *Id.*

Relatedly, "[a]n employer has discretion to require that an employee's leave request 'be supported by a certification issued by the health care provider of the . . . employee[.]'" *Rhoads*, 257 F.3d at 383 (alteration in original) (quoting 29 U.S.C. § 2613(a)).   A certification must be both "complete and sufficient."   29 C.F.R. § 825.305(c); *see also* 29 U.S.C. § 2613(b) (setting out the circumstances under which a certification "shall be sufficient").   A certification is insufficient if "the information provided is vague, ambiguous, or non-responsive."   29 C.F.R. § 825.305(c).   If the certification is insufficient, the employer must "state in writing what additional information is necessary," and "provide the employee with seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts) to cure any such deficiency." *Id.*   If the deficiency is "not cured in the resubmitted certification, the employer may deny the taking of FMLA leave . . . ." *Id.*; *see also id.* § 825.303(b) ("Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying.").

On several occasions, Ms. Testerman complained to the Company about her difficulty

working when the temperature inside the warehouse became particularly hot.  On August 10,

2010, she submitted to the Company an "Employee Incident Report" concerning a health

incident that occurred on July 21, 2010.  (Employee Incident Report.)  In a letter attached to that

document, she described the incident as follows:

> For the last (3) weeks or so temperatures and humid[it]y both outside and
> inside the un[-air]conditioned warehouse I work in have been excessive.  My
> job responsibilities require an (8) hr shift on a standup that puts off
> considerable heat from a battery that is right next to your body in a semi
> enclosed area.  Between equipment heat and excessive temperatures and
> humidity in the warehouse my body has been fighting heat exposure.
>
> While operating the standup once the temperature and humid[it]y increases
> (usually around 9:00 – 10:00 a.m.) I feel hot, sweat profusely, my face flushes
> to a bright red, my stomach starts cramping and I feel sick to my stomach, and
> begin having diarreaha [sic].  Once I start having these symptoms if I exert
> myself in any way I start feeling light headed and my heart rates increase.
> Short breaks do help, but once I return to my duties the symptoms return.

(*Id.* at 2.)  In a separate letter also attached to the Employee Incident Report, Ms. Testerman

wrote the following:

> On Wednesday July 21, 2010 I requested permission from Mike York to leave
> work at 10:00 a.m.  It was extremely warm and humid that day and I started
> feeling very ill after my normal shift on the standup.  I returned to work
> although I continued to feel sick.  Symptoms included:  light head[ed]ness,
> profuse sweating, skin chafing from constant sweating and wet clothes,
> diarreaha [sic], and nasausness [sic].

(Employee Incident Report 3; s*ee also* Testerman Dep. 57-58 (describing incident).)

On August 12, 2010, Ms. Testerman spoke with Ms. Kaba, who told her "to take

advantage of the Gatorade and Kool pops that [the Company] made available" and "take breaks

as necessary."  (Kaba Aff. ¶ 9.)  Also on August 12, Ms. Testerman saw Dr. Kleeman, the

Company's doctor.  (*See* Medical Notes 2.)  She brought with her a note from her physician, Dr.

Clark, dated August 6, 2010, and stating the following:

> This employee is suffering from heat related illness during her time at work. I suspect that she will need breaks during the day. As well she has a muscle strain that will be aggravated by strenuous activity. She is not disabled from any job but decreased exposure to heat and a position where she is not repeatedly stepping would be advisable.

(*Id.* at 4.)[12]  Dr. Kleeman's notes from this encounter indicate that he asked Ms. Testerman "to have her physician give [the Company] a list of any medical conditions that might be effected [sic] by excessive heat or present . . . difficulty tolerating heat." (*Id.* at 2.)

On August 26, 2010, Ms. Testerman returned to Dr. Kleeman with a note from another physician, Dr. Omolara Olowoyeye, dated August 16, 2010, and stating the following:

> This employee is suffering from heat related illness during her time at work. The patient has Diabetic Mellitus Type II and the excessive heat conditions at work may destabilize her autonomic regulation of heat. She will benefit from breaks during the day and to regular hydration as well. Additionally, she has a muscle strain that will be aggravated by strenuous activity. She is not disabled from any job but decreased exposure to heat and a position where she is not repeatedly stepping would be advisable.

(*Id.* at 3.)  The letter further sought to excuse Ms. Testerman from work from August 15, 2010, through August 22, 2010, for medical reasons. (*Id.*)[13]  Dr. Kleeman's notes from the August 26 encounter recognize the physician's recommendations, but also state that "[a] discussion with [Ms. Testerman's] manager indicates that water and Gatorade are available for hydration, that fans are available for cooling and her job does not require repeated stepping." (*Id.* at 1.)  The notes conclude as follows:

> Anna was advised that her medical condition is not unique and she needs the same assist[ance] of fluids and ventilation as the rest of her coworkers. She alleges that she does not receive an equal opportunity to rotate positions and be in a ventilated area. Anna does not need to return [to meet Dr. Kleeman]

---

[12] This reference to "muscle strain" apparently refers to groin pain Ms. Testerman was experiencing. (*See* Testerman Dep. 61.) Ms. Testerman does not suggest that her muscle strain was related to the heat.
[13] The Company's attendance summary for Ms. Testerman records August 17, 2010, through August 20, 2010, as "[s]ick [d]ays," and September 1, 2010, as "[a]bsence [u]npaid." (Employment and Absence Summary.)

unless there is a changed [sic] in her medical condition.

(*Id.*)

On August 27, 2010, Ms. Testerman gave the Company the FMLA certification Dr. Clark had completed for her.   (FMLA Certification.)   As noted above, Dr. Clark stated in that certification that Ms. Testerman had "unstable autonomic regulation of heat" causing "[e]xtreme heat intolerance" that rendered her "[u]nable to function in extreme heat." (*Id.* at 2, 3.)  Dr. Clark estimated that Ms. Testerman was likely to have two flare-ups per month, each lasting two days.  (*Id.* at 3.)[14]

On August 30, 2010, Ms. Brumwell (the Company's nurse) provided a written response to Ms. Testerman that stated the following:

> The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request.   You must provide the following information no later than 9/10/10, unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.
>
> Need your doctor to specify what they consider "extreme [h]eat" to be.  I will need a specific temperature or temperature range for heat in the building, not the temperature forecast for outside[.]

(FMLA Emails 2.)

Later that day, Ms. Testerman sent an email to Ms. Brumwell apparently refusing to seek clarification from her doctor as to what temperature range constituted the "extreme" heat that would preclude Ms. Testerman from working.  (*See id.* at 1 (stating "[t]hese forms should be sufficient as completed").)   In an email she sent Ms. Brumwell later that afternoon, Ms. Testerman indicated she was changing doctors and therefore "wish[ed] to withdraw the FMLA forms [she] submitted from Dr. Clark" because she planned to ask her new doctor to "fill out the

---

[14] Ms. Testerman apparently sought intermittent leave.  *See* 29 C.F.R. § 825.202.

FMLA forms . . . ."  (*Id.* at 4.)  On September 16, 2010, however, she sent Ms. Brumwell another email, this time indicating that her endocrinologist was "unable to clarify the temperature range" the Company had requested, and seeking to "resubmit Dr. Clark's FMLA forms for approval . . . ."  (*Id.* at 5.)[15]   In her deposition, Ms. Testerman testified that she "repeatedly" asked the Company "what the inside temperatures were so that [she] could go back to [her] doctor and discuss the temperatures and the effect it [sic] had" on her.  (Testerman Dep. 95.)  She clarifies this point in her affidavit, stating that she sought information on temperatures inside the warehouse from Ms. Kaba, Dr. Kleeman, Ms. Brumwell, and "the individual who kept the records of the temperature logs," but none of them gave her the information.  (Testerman Aff. ¶ 11.)

These facts are insufficient to allow Ms. Testerman to prevail on her FMLA claim.  The Company was permitted to ask Ms. Testerman to obtain medical clarification as to what temperatures constituted the "extreme heat" that could trigger her medical condition, and it was Ms. Testerman's responsibility to furnish a complete and sufficient certification demonstrating she required FMLA leave.  Whether heat is "extreme" can depend on the individual, the nature of the work, and the baseline temperatures in the work environment.  Under these circumstances, therefore, the term "extreme heat" can reasonably be viewed as vague, and vague information in an FMLA certification renders it insufficient.  *See* 29 C.F.R. § 825.305(c).  The Company gave Ms. Testerman more than the required seven days to cure the deficient certification. (FMLA Emails 2.); *see* 29 C.F.R. § 825.305(c).  Ms. Testerman, however, was unable to provide the additional information, as she was required to do.  *See id.* § 825.305(d) ("It is the employee's

---

[15] Ms. Testerman also testified that this doctor "did not feel [she] needed FMLA leave for [her] diabetes . . . ." Testerman Dep. 123.

responsibility [] to furnish a complete and sufficient certification . . . .").  Instead, Ms. Testerman informed the Company that her endocrinologist was "unable to clarify the temperature range" the Company needed to determine if FMLA leave was applicable, (FMLA Emails 5), and, as the Company later learned, that same doctor "did not feel [Ms. Testerman] needed FMLA leave for [her] diabetes," (Testerman Dep. 123).  Ms. Testerman also testified in her deposition that no other doctor said she needed FMLA leave for any other serious condition.  (Testerman Dep. 123.)  Accordingly, the Company acted permissibly when it denied Ms. Testerman FMLA leave after she was unable to furnish a sufficient certification from a doctor detailing what temperature range would be "extreme."

Ms. Testerman argues that the Company was required under 29 C.F.R. § 825.307(a) to contact Dr. Clark for the clarification it sought, rather than seek it from Ms. Testerman.  But that regulation authorizes an employer to seek clarification "to understand the meaning of a response" from the employee's health care provider only where the FMLA certification is already "complete and sufficient."  *Id.*  As described above, the Company reasonably viewed Dr. Clark's certification as insufficient because, in this context, "extreme heat" is vague.  Therefore this provision did not apply to Ms. Testerman's situation.

Accordingly, even viewing the facts in the light most favorable to Ms. Testerman, no reasonable jury could find the Company interfered with Ms. Testerman's FMLA rights.  Ultimately, Ms. Testerman was unable to provide the information the Company properly requested in order to determine whether she was entitled to FMLA leave in August 2010.[16]  The Company's motion for summary judgment on Ms. Testerman's FMLA interference claim will be

---

[16] Ms. Testerman was absent for 189 days in 2011, or 73 percent of the year.  (Employment and Absence Summary.)  Much of this period was covered by workers' compensation benefits or FMLA leave.  (*Id.*; *see also* Kaba Aff. ¶¶ 21-23.)

granted.[17]

## IV.    FMLA Retaliation

Ms. Testerman also alleges that the Company retaliated against her for asserting her

FMLA rights, and the Company has moved for summary judgment on that claim.  In addition to

its "prescriptive rights and protections, the [FMLA] also contains *proscriptive* provisions that

protect employees from discrimination or retaliation for exercising their substantive rights under

the FMLA."  *Yashenko*, 446 F.3d at 546.  Specifically, 29 U.S.C. § 2615(a)(2) states that "[i]t

shall be unlawful for any employer to discharge or in any other manner discriminate against any

individual for opposing any practice made unlawful by this subchapter."  The FMLA also bars

employers from "discharg[ing] or in any other manner discriminat[ing]" against someone who

"has filed any charge" under the FMLA.  *Id.* § 2615(b)(1).  A regulation adds that employers

may not "retaliat[e] against an employee . . . for having exercised or attempted to exercise

FMLA rights."  29 C.F.R. § 825.220(c).  These provisions "provide[ ] a cause of action for

retaliation."  *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009).

"FMLA claims arising under the retaliation theory are analogous to those derived under

---

[17] In its reply, the Company belatedly asserts that Ms. Testerman failed to show that she had a serious medical condition that would qualify her for FMLA leave.  The Company did not raise this argument in its opening brief, and it is therefore waived.  Even if it were not waived, however, the argument would fail.  An eligible employee is entitled to FMLA leave when a "serious health condition" makes her unable to "perform the functions" of her position.  29 U.S.C. § 2612(a)(1)(D).  The FMLA defines "serious health condition" to include "continuing treatment by a health care provider."  *Id.* § 2611(11).  A regulation clarifies that chronic serious health conditions fall within this definition, and defines such a condition as one that
> (1) Requires periodic visits for a treatment by a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c).  Dr. Clark's certification set out the dates of numerous visits by Ms. Testerman, described the duration of Ms. Testerman's diabetic condition as "lifetime," and indicated that her condition would cause episodic flare-ups that prevent her from performing her job functions.  (FMLA Certification.)  Dr. Clark thus certified Ms. Testerman as having a serious health condition within the meaning of the FMLA, and the fact that Dr. Clark did not use the term "serious health condition" is irrelevant.

Title VII and so are analyzed under the burden-shifting framework" of *McDonnell Douglas*. *Yashenko*, 446 F.3d at 550-51.  Thus, to succeed on a retaliation claim, a plaintiff "must first make a prima facie showing 'that [s]he engaged in protected activity, that the employer took adverse action against h[er], and that the adverse action was causally connected to the plaintiff's protected activity.'"  *Id.* at 551 (citation omitted).  If the plaintiff puts forth enough evidence to establish a prima facie case of retaliation and the employer offers a non-discriminatory explanation for her termination, the plaintiff bears the burden of showing that the employer's proffered explanation is a pretext for FMLA retaliation.  *Id.*

Ms. Testerman appears to argue that the Company retaliated against her for asserting her FMLA rights by disciplining her for a high rate of incidental absenteeism and then, a year and a half later, terminating her.  Even assuming she could establish a prima facie case, however, her FMLA retaliation claim fails for the same reason her Title VII retaliation claim fails: she has offered nothing to suggest the Company's proffered explanations for either the discipline or termination were pretextual, and she has not presented enough evidence for a reasonable jury to find that retaliatory animus was a but-for cause of the discipline or termination.  Accordingly, the court will grant the Company's motion for summary judgment on Ms. Testerman's FMLA retaliation claim.

## V.      ADA Failure to Accommodate

The Company also has moved for summary judgment on Ms. Testerman's claim that the Company discriminated against her on the basis of disability in violation of the ADA.  The ADA makes it illegal for an employer to "discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a).  A plaintiff seeking to establish a prima facie case for

failure to accommodate under the ADA must show that (1) she had a disability within the meaning of the ADA; (2) her employer had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting *Rhoads*, 257 F.3d at 387 n.11).  This court will assume Ms. Testerman had a disability within the meaning of the ADA[18] and the Company had notice of her disability.[19] Viewing the facts in the light most favorable to the nonmoving party, as this court is required to do at the summary judgment stage, there still is not sufficient evidence to show the Company failed to engage in the required interactive process or refused to provide a reasonable accommodation.[20]  *See Wilson*, 717 F.3d at 346.  Accordingly, the Company's motion for summary judgment will be granted as to Ms. Testerman's ADA claim for failure to accommodate.

ADA regulations provide that, "[t]o determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."  29 C.F.R. § 1630.2(o)(3).  "The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his

---

[18] The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  Because "diabetes substantially limits endocrine function," 29 C.F.R. § 1630.2(j)(3)(iii), it will "virtually always be found to impose a substantial limitation on a major life activity," *id.* § 1630.2(j)(3)(ii), and is thus nearly always a "disability" under the ADA.

[19] For example, Ms. Testerman disclosed to the Company in 2005 on a health questionnaire that she had diabetes, (ECF No. 45-2), and her doctor described her as having "Diabetic Mellitus Type II," (Medical Notes 3).

[20] The Company also argues that Ms. Testerman abandoned her ADA claim when, during her deposition (at which time she was unrepresented), she was asked whether she was "bringing a claim that [she was] discriminated against due to an alleged disability," and responded that she was "not filing a claim for that."  (Testerman Dep. 199-200.) Ms. Testerman responds that she did not intend to abandon her ADA claim.  Rather, she says she confused her ADA claim with her disability claim addressed by the Maryland Workers' Compensation Commission.  (Testerman Aff. ¶ 14.)  Particularly given the fact that Ms. Testerman was unrepresented when she was deposed, the court will decline to find that this single statement constituted a waiver of her ADA claim.

disability and his desire for an accommodation for that disability." *Wilson*, 717 F.3d at 346-47. The duty is triggered "even if the employee fails to identify a specific, reasonable accommodation." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015). Responsibility for identifying a reasonable accommodation, however, is shared between the employer and employee.  *See May v. Roadway Express, Inc.*, 221 F. Supp 2d 623, 627-28 (D. Md. 2002) (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)). Furthermore, a party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution. *See EEOC v. Fed. Express Corp.*, 513 F.3d 360, 375 n.11 (4th Cir. 2008); *see also Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

As an initial matter, Ms. Testerman's failure to accommodate claim is relevant only to the summer months, and concerns only the summer of 2010.  The health issues Ms. Testerman complained of resulted from a combination of her diabetes and the summer heat.  (Medical Notes 3.)  And Ms. Testerman was out on leave in the summer of 2011, (Employment and Absence Summary), and was terminated before the summer of 2012, (Termination Letter).  Therefore, only the accommodations that the parties discussed in the summer of 2010 are relevant to this claim.

Ultimately, even viewing the evidence in the light most favorable to her, Ms. Testerman has not shown that the Company did not engage in the interactive process in good faith or provide Ms. Testerman with a reasonable accommodation for her diabetes.  Ms. Testerman failed to provide the Company the specific temperature range at which her health would be affected while working in the warehouse during the summer, and she failed to identify any specific

accommodations other than fans, breaks, and hydration—all of which the Company reasonably provided.  And the Company actively followed up on Ms. Testerman's complaints by attempting to determine the causes of her problems and whether there were reasonable solutions to them. For example, the Company conducted two investigations into Ms. Testerman's complaints during the summer of 2010, one by Ms. Soler in May and one by Ms. Kaba in August.  (*See* May 2010 ER Case Closure Report; Kaba Aff. ¶¶ 9, 10, 11, 13.)  And when Ms. Testerman brought in a doctor's note explaining she could not work in "extreme heat," the Company reasonably requested clarification from Ms. Testerman—information her doctor could not provide.  (FMLA Emails 2, 5.)   Furthermore, the Company responded to the specific accommodations Ms. Testerman did propose.  In particular, she asked for a fan and breaks, and was given both.[21]  It is true that her coworkers may have made it difficult for Ms. Testerman to use the fan, (Sontag Assessment, Def.'s Ex. 5, ECF 35-7; August 2010 ER Case Closure Report), but the Company had made the fan available and it investigated the coworker issues, and ultimately Ms. Testerman was able to use the fan (Sontag Assessment; Testerman Dep. 73, 131).  And Ms. Testerman may have been reluctant to take breaks, (Testerman Dep. 66), but she was specifically told by her supervisor that she was allowed to, (Sontag Assessment; Testerman Dep. 71, 131).

There is not sufficient evidence to show the Company failed to engage in an interactive process in good faith and, as a result, failed to provide Ms. Testerman a reasonable accommodation.  Accordingly, the Company's motion will be granted as to Ms. Testerman's claim for failure to accommodate under the ADA.

## VI.   ADA Retaliation

Ms. Testerman's final claim is that the Company retaliated against her in violation of the

---

[21] Gatorade and Kool pops were made available to all employees.  (Kaba Aff. ¶ 9.)

ADA, and the Company also has moved for summary judgment on this claim.  ADA's anti-retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . under this chapter."  42 U.S.C. § 12203(a).  "To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) [s]he engaged in protected conduct, (2) [s]he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action."  *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

The Company's primary argument is that Ms. Testerman has not produced evidence sufficient to establish a causal link between her request for an accommodation and her termination.  The Company is correct.  Ms. Testerman's health issues and request for a fan occurred in the summer of 2010, but she was not terminated until February 13, 2012.  Ms. Testerman has offered no other evidence to establish the requisite causal link.  Absent more, this gap is too long to infer causation.  *See, e.g.*, *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation.").  Accordingly, the Company's motion for summary judgment will be granted as to this claim.

## CONCLUSION

For the reasons stated above, the Company's motion for summary judgment will be granted.  A separate order follows.


September 29, 2015                                      /S/
Date                                               Catherine C. Blake
                                                   United States District Judge